IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

DWIGHT W. THORN

    v.

KATHLEEN SEBELIUS

:
:
:   Civil Action No. DKC 10-0299
:
:
:

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this Title VII employment action is a motion to dismiss or for summary judgment (ECF No. 13) filed by Defendant Kathleen Sebelius.[1] The issues are fully briefed and the court now rules pursuant to Local Rule 105.6, no hearing being deemed necessary. For the reasons that follow, the Secretary's motion, construed as a motion for summary judgment, will be granted.

**I. Background**

**A. Factual Background**

The following facts are uncontroverted.

During the time relevant to this case, the National Institutes of Health ("NIH") employed Plaintiff Dwight Thorn as a Patient Appointment System Manager & Information Technology

_____

[1] Sebelius is the Secretary of Health and Human Services. She has been sued in her official capacity as the head of the agency that oversees the National Institutes of Health.

Specialist. (ECF Nos. 13-1; 13-2). Thorn worked in the Computerized Appointment System ("CAS") Office, which was part of the Ambulatory Care Services Department ("ACS") of the NIH's Clinical Center ("CC"). (ECF Nos. 13-1; 13-3; 25-1). Thorn assumed his position in 1996, after he approached then-department chief Steven Groban about a job opening. (ECF No. 13-2). In his new position, Thorn was charged with broad responsibility over the CAS. (ECF No. 13-10). In particular, Thorn was responsible for maintaining and evaluating the CAS system, its security, its hardware and software, and its files. (ECF No. 13-10). Thorn was required to evaluate user needs, assist CC personnel in using clinic data within the CAS, provide trouble-shooting assistance, and perform several other functions. (ECF Nos. 13-10; 25-1). He also supervised junior staff and – at least initially – administered the ACS's voicemail system. (ECF No. 13-10).

Although Thorn was appointed at the GS-11 pay grade, Thorn contends that Groban promised him a promotion to the GS-12 pay grade within 3 years. (ECF No. 13-2). In 1999, however, Thorn's promotion to GS-12 was denied. (ECF Nos. 13-2; 25-1). In 2002, Thorn again approached management and requested a promotion. (ECF No. 13-2). Alternatively, Thorn asked that his position be audited to ensure that it was "properly classified." (ECF No. 13-2). That request was also denied. (ECF No. 13-2).

During his first few years in his new position, Thorn was often recognized for good job performance. (ECF Nos. 13-2; 25-1; 25-8 through 25-12). He also received "acceptable" evaluations in 1999 (ECF No. 25-13), 2000 (ECF Nos. 25-14; 25-15), 2001 (ECF No. 25-16), and 2002 (ECF Nos. 25-17; 25-18).

## 1. 2003

On the morning of June 16, 2003, Thorn's first-line supervisor, Gene Hulen, asked Thorn to help him in reviewing and approving travel vouchers. (ECF Nos. 13-2; 13-10). Hulen explained that he needed help because an employee in the Voucher Office was absent. (ECF Nos. 13-2; 13-10). Thorn agreed to help and signed one voucher. (ECF Nos. 13-2; 13-10). But when more vouchers were brought to Thorn for review and approval, Thorn refused – he did not wish to be involved in approving vouchers and felt that responsibility was interfering with his normal responsibilities. (ECF Nos. 13-2; 13-10). Thorn believed that three reasons justified his refusal: (1) he was being asked to sign documents without knowing whether the information contained in them was true; (2) "expectations" concerning the vouchers were "unclear"; and (3) he had not received formal training. (ECF Nos. 13-2; 13-11; 25-1). Hulen insisted that Thorn was authorized to sign the vouchers and had been trained on how to do so, but Thorn still refused to help. (ECF Nos. 13-2; 13-10). Later that day, Hulen sent Thorn an

email summarizing the incident and asking him to confirm what happened. (ECF Nos. 13-2; 13-10). Hulen explained that he needed Thorn to respond "[b]ecause before [he] may be forced to take other action" he wanted it to be "clear" in Thorn's mind that he had refused to perform the requested task. (ECF Nos. 13-2; 13-10; 25-19). Hulen's email told Thorn: "You need to understand that there may be repercussions. If you don't understand that, then maybe seeing it in writing makes it a bit clearer." (ECF Nos. 13-2; 13-10; 25-1; 25-19). Thorn, who felt this email was "retaliatory" (ECF Nos. 13-2; 13-10), apparently did not respond to Hulen's email.

Two weeks later, on July 31, 2003, Hulen changed Thorn's 6:00 am to 2:30 pm "tour of duty" (*i.e.*, shift) to 7:30 am to 4:00 pm. (ECF Nos. 13-2; 13-13; 25-11; 25-21).[2] Thorn felt this change resulted from his refusal to sign the travel vouchers, as he says his supervisors had never before voiced concerns about his work schedule. (ECF Nos. 13-2; 13-11). The letter changing Thorn's hours, on the other hand, noted concerns about coverage during standard office hours, 7:30 am to 5:00 pm, Monday through Friday. (ECF Nos. 13-11; 13-13; 25-21).

_____

[2] Another employee who previously had a similar tour of duty also had her tour changed to the later start time. (ECF No. 13-14).

Thorn wrote to Hulen on August 6, 2003 and argued that the tour of duty change would "place a hardship" on him and his family. (ECF Nos. 13-11; 13-13; 25-21). He accused Hulen of giving "little consideration to the personal impact," namely on Thorn's ability to pick his children up from school in the afternoon. (ECF Nos. 13-11; 13-13; 25-21). He requested that his work hours not be changed. (ECF Nos. 13-11; 13-13; 25-21). In response, Hulen offered to allow Thorn more time to "arrange personal issues." (ECF Nos. 13-11; 13-13; 25-21). He nevertheless felt that the hours change was needed because (1) the old reasons for Thorn's early shift were no longer present and (2) it would provide better coverage for CAS services. (ECF Nos. 13-11; 13-13; 13-14; 25-21). Thorn asked for a 90-day extension of his then-existing hours. (ECF No. 13-11; 13-13).

In 2003, the CC converted from a Lucent telephone system to a new phone system managed by NIH's Center of Information Technology ("CIT"). Thorn led that project. (ECF No. 13-14). On August 27, 2003, Karen Kaczorowski, Thorn's second-line supervisor, asked a contractor working on the conversion project "leading questions" concerning Thorn's job performance. (ECF Nos. 13-2; 25-1). In particular, Kaczorowski asked the contractor to let her know if an "oversight in the need for extra [network hardware] is due to something that was not provided by [Thorn]." (ECF Nos. 13-2; 25-22). Notably, because

5

of the consolidation of telephone services, Thorn and his office were subsequently removed from managing the telephones. (ECF No. 13-15).

In September 2003, Thorn requested a transfer to another department. (ECF Nos. 13-2; 25-1). According to him, he was "able to convince the Chief of the Information Technology Department to allow [him] to work on a special project in his department resulting in a permanent transfer to a new higher paying position." (ECF No. 13-2). Kaczorowski denied the request (ECF No. 13-2), as she believed there were no vacancies in Thorn's requested department (ECF No. 13-14).

The telephone system conversion caused additional problems for Thorn in October 2003. Initially, the new telephone system did not have any paging feature, resulting in numerous complaints. (ECF No. 13-14). On October 15, Kaczorowski became frustrated with the lack of response from Thorn or Hulen concerning why the paging features had not been restored. (ECF No. 13-14). "Therefore, as department head," she made the decision to reach out to CIT herself and resolve the problem as the "main point of contact." (ECF No. 13-14). She instructed a CIT employee, Cheryl Moxley, to speak directly with her on the paging issues rather than working with Thorn. (ECF Nos. 13-14; 25-1; 25-23). Kaczorowski indicated that she preferred to work directly with Moxley because she would "have to explain to the

physicians and senior leadership at the CC the status [of getting the paging feature restored]." (ECF No. 25-23).

Thorn received an acceptable performance rating in 2003. (ECF No. 13-16).

**2. 2004**

The problems with the telephone system were later reflected in Thorn's evaluation. In an evaluation on February 27, 2004, Hulen stated that "problems and communications with Verizon . . . [resulted in] important areas and needs . . . not [being] identified until direct installation began, which caused delays and inefficiencies." (ECF Nos. 13-2; 13-22; 25-24). Thorn says this evaluation was "incorrect." (ECF No. 25-1).

Thorn also received three emails from his superiors in 2004 that he characterizes as "unwarranted reprimands . . . based on the fact that my supervisors failed to get all the facts before making judgment." (ECF Nos. 13-2; 13-11). First, on January 21, 2004, Kaczorowski informed Hulen and Thorn that the CAS would no longer distribute reports. (ECF Nos. 13-11; 13-17; 25-25). Thorn forwarded the email on to another individual, who in turn forwarded it to others. (ECF Nos. 13-11; 13-17; 25-25). When Kaczorowski learned of the emails, she wrote Thorn and asked: "Why are you doing this? You are creating confusion." (ECF Nos. 13-11; 13-17; 25-25). He responded that he merely wanted to "provide smooth transition from CAS providing

reports." (ECF Nos. 13-11; 13-17; 25-25). He adds that his emails "provided clarity not confusion." (ECF No. 25-20).

Second, on July 29, 2004, Hulen forwarded Thorn an email from a nurse complaining of long wait times to make appointments with CAS. (ECF Nos. 13-11; 13-17; 25-25). He asked that Thorn "keep [his] visits to [other employees'] office[s] as short as possible and only for business purposes." (ECF Nos. 13-11; 13-17; 25-25). Hulen told Thorn that he had received "another comment about you visiting when you could be answering phones." (ECF Nos. 13-11; 13-17; 25-25). Thorn responded by defending his actions and telling Hulen that "it would be appreciated" if Hulen "would make some effort to find out what [Thorn] was doing before [Hulen] ma[d]e the assumption that [Thorn] was just 'so called visiting.'" (ECF Nos. 13-11; 13-17).

Third, and finally, Kaczorowski received an email from a CC nurse indicating that Thorn suggested the nurse contact Kaczorowski about problems she was having with her phone. (ECF No. 13-11; 25-25). Kaczorowski forwarded the email to Thorn, saying, "I am not sure why you couldn't take the time to give her the number [to telecommunications] or to refer her to [another employee]??" (ECF No. 13-11; 25-25). Thorn answered that he did refer the nurse to telecommunications and did not direct her to Kaczorowski. (ECF No. 31-11; 25-25).

On August 16, 2004, Hulen issued Thorn a "letter of instruction," which Thorn also felt was retaliatory. (ECF Nos. 13-2; 13-18; 25-26). As part of a new NIH Business System, staffers were asked to enter requests to obtain an Employee Identification Number ("EIN") for new patients at the CC. (ECF No. 13-5). By obtaining the EINs, the hospital was able to reimburse patients for travel and handle certain other administrative tasks. (ECF No. 13-5). Thorn was one of only three people trained to request EINs. (ECF No. 13-35).

According to Kaczorowski, she wanted a supervisor such as Thorn to enter the EIN requests "because of the nature of the function of creating an account for an individual to receive government funds." (ECF No. 13-5). Kaczorowski felt Thorn was especially suited to the task because he was typically not involved in the creation or approval of voucher requests and would be asked to handle only 10-15 EIN requests a day. (ECF No. 13-5).[3] The letter of instruction orders Thorn to enter the

---

[3]    Although Kaczorowski conceded that this added an "additional duty" that was not within Thorn's job description, she maintained that it was "common practice within our department and within NIH, in general, to assign ancillary duties such as this one to employees which management believes are capable of the duties, as long as those duties fall generally within the employee's job description." (ECF No. 13-5). Hulen also stated that he "expect[s] employees to perform 'other duties as assigned' even where there is no potential for future promotion inherent within the assignment." (ECF No. 13-8).

new patients' EIN requests.  (ECF Nos. 13-11; 13-18; 25-26).  It further explains:

> Please understand that management has the right to assign duties to employees and employees are required to follow instructions of their managers, unless an employee is concerned for their safety. Employees have the right to grieve instructions they do not agree with, but until the grievance is addressed an employee must perform the tasks they are assigned. This concept is called "work now, grieve later."  It is not relevant that the tasks I am assigning to you are not specifically mentioned in your position description.  The tasks are within the realm of the type of work you perform.  Failure to follow my instructions will result in discipline.

(ECF Nos. 13-11; 13-18).  In Thorn's view, this letter threatened action "if [he] refused to perform additional duties out of [his] scope of work[,]" and stemmed from Thorn's complaints about "unfair, inconsistent and unethical treatment of employees."  (ECF No. 13-2).  For example, Thorn felt that the department had been inconsistent in who it allowed to work alternative or flexible work schedules.  (ECF No. 13-2).  In a response letter dated August 31, 2004, Thorn wrote that the letter of instruction presented a "dark cloud of misunderstanding."  (ECF Nos. 13-11; 13-18; 25-26).  He complained that service had suffered in CAS because management had been using his staff to fill needs in the Travel Voucher office.  (ECF Nos. 13-11; 13-18; 25-26).

The same day, Hulen notified Thorn that he had received a "compliment" for "outstanding customer service." (ECF No. 13-2). The compliment had been made almost two months prior, on June 26, 2004. (ECF Nos. 13-2; 13-19).

Thorn received an acceptable performance rating in 2004. (ECF No. 13-22).

### 3. 2005

In 2005, Thorn again asked that his position be audited, as he believed he was being asked to perform duties not included in his job description. (ECF No. 13-2). This third request was denied, ostensibly because the department was undergoing a review for potential outsourcing. (ECF No. 13-2). Under such review, all positions were "frozen."[4] (ECF No. 13-8).

On July 6, 2005, Hulen issued Thorn a "Letter of Counseling" for his failure to follow supervisory instructions on June 24, June 29, and June 30, 2005. (ECF Nos. 13-23; 25-30).[5] According to the letter, Thorn failed to enter new patients in the system and request EINs within a two-hour window

---

[4] Kaczorowski further explained: "When a particular function is identified to be studied as part of the A-76 initiative, it means that all the employees identified to be[] in the scope of the study[] have their positions frozen until the study is complete and a determination is made on who is awarded the contract." (ECF No. 13-15).

[5] Hulen sent Thorn several emails instructing him to enter EINs in a timely fasion. (ECF No. 13-36, at 3-13).

as Hulen had instructed him on the prior three occasions; this failure "increase[d] the backlog and delay[ed] processing of travel reimbursements." (ECF Nos. 13-23; 25-30; *see also* ECF No. 13-35). The letter further warned that "[d]isciplinary action may be taken if the timeliness of entering EINs does not improve." (ECF Nos. 13-23; 25-30). Kaczorowski also reported that she received "numerous complaints" that Thorn was not completing the EIN requests in a timely fashion. (ECF No. 13-5). As a result, she shifted the responsibility for EIN requests to three other employees and supported Hulen's decision to issue the letter of counseling. (ECF No. 13-5).

Thorn responded on July 14, characterizing the letter as "untruthful" and "retaliatory" and arguing that it did not "present a clear representation of the facts." (ECF Nos. 13-2; 25-30). He also lodged several other criticisms of the EIN process. (*See generally* ECF No. 13-24).

In 2005, CC decided to replace the CAS with a decentralized scheduling system, Scheduling.com. (ECF No. 13-2). Because he felt he was the "hospital's leading authority and expert on patient appointment scheduling," Thorn "expected to assume a leadership role . . . in designing, building-out and managing

the new system." (ECF No. 13-2).[6] Several issues addressed by the implementation team were indeed within Thorn's purview. (ECF No. 25-33). Nevertheless, Thorn was not included on the implementation team. (ECF No. 13-30; 13-31). Instead, Kaczorowski filled the team with "senior level leadership positions" or "major customers" who were considered "subject experts in their area." (ECF No. 13-5). By email on August 5, 2005, Kaczorowski informed Thorn that she would be the project lead and Thorn's role had yet to be determined. (ECF Nos. 13-3; 25-33).

Thorn says his responsibilities were then given "deliberately and systematically" to four white,[7] female co-workers. (ECF No. 13-3). According to Kaczorowski, however, Thorn's reduced responsibilities resulted from "a reorganization of the system administrator functions . . . [that] resulted in less responsibility over the scheduling system functions for all the staff in the Central Scheduling Office." (ECF No. 13-5; 13-

_____

[6]     Two other employees, Lieutenant Commander Antoinette Jones and Jose Miletti, suggested that Thorn be involved in the Scheduling.com committee. (ECF Nos. 13-28; 25-38; 25-39; 25-40).     Another employee's statement – Harvey McDonald – was unsigned and not properly considered as evidence. (ECF No. 25-39).

[7]     Kaczorowski states that one of these co-workers was actually Hispanic. (ECF No. 13-15). She also provided more detailed explanation for the selection of each of these individuals. (ECF No. 13-15).

15).  Hulen supported this explanation, saying that the Scheduling.com system "allowed many people to perform the functions that previously only Mr. Thorn or the CAS Staff could perform within CAS." (ECF No. 13-8).  He explains that the hospital shifted to Scheduling.com only because the system was "much more sophisticated and easier to use than the antiquated CAS system and [it] afforded the hospital more flexibility." (ECF No. 13-8).  Kaczorowski also observed that Thorn did not volunteer to assist in building schedules within the Scheduling.com, which forced her to involve other staff members. (ECF No. 13-15).

In December 2005, Thorn says he received "several emails from [his] supervisors which substantiated that [his] duties had been assigned to other white and female employees in [his] unit." (ECF No. 25-1, at 13).  The complaint points specifically to an email on December 30, 2005 that allegedly "remov[ed] him from his duties and responsibilities as patient appointment manager" (ECF No. 1 ¶ 21), but there is little description of the content of that email in the factual record.[8]

---

[8]  Kaczorowski discusses the email obliquely, but does not fully explain its contents.  (ECF No. 13-15).

### B.  Procedural History

Thorn first sought EEO counseling on September 29, 2004. (ECF No. 25-27). He subsequently filed a formal complaint alleging that he was subjected to a hostile work environment for engaging in prior protected EEO activity on December 28, 2004. (ECF No. 13-32). The agency accepted seven questions for investigation. (*Id.*). Specifically, the agency considered:

> Whether [Thorn] was subjected to a hostile work environment in reprisal for engaging in prior protected EEO activity when:
>
> 1.  On June 16, 2003, [Thorn] received an email message from his supervisor threatening disciplinary action if he refused to perform additional duties beyond the scope of his job description.
>
> 2.  On July 31, 2003, [Thorn]'s tour of duty was changed to more unfavorable hours, negatively impacting him and his family.
>
> 3.  In September 2003, [Thorn]'s request for a transfer to another department was denied.
>
> 4.  On October 15, 2003, [Thorn]'s supervisor instructed a contractor he had been working with to no longer work with [Thorn] on the telephone conversion project.
>
> 5.  On August 16, 2004, [Thorn] was given a "letter of instruction" from his supervisor, threatening disciplinary action if he refused to perform additional duties beyond the scope of his work.
>
> 6.  On August 16, 2004, [Thorn] received an email from his supervisor stating that he had received a compliment on his behalf. However, the compliment was received in June

> 2004, and not shared with [Thorn] until two
> month[s] later.
>
> 7.    On January 23, 2004, July 29, 2004, and
> September   16,   2004,   [Thorn]   received
> unwarranted reprimands that included unfair
> and counterproductive comments regarding his
> work performance.

(ECF No. 13-32).[9]   Thorn sought counseling a second time on July

17, 2005, and a second formal complaint followed on August 18,

2005.   (ECF No. 13-33).   The agency accepted for investigation

the question of whether Thorn "was subjected to discrimination

on the bases of race (Black) and reprisal for prior EEO activity

when on July 6, 2005, he received a letter of counseling."

(*Id.*).   Finally, on March 1, 2006, Thorn filed a third formal

complaint after seeking EEO counseling.   (ECF No. 13-34).   The

third complaint raised the issue of whether Thorn "was subjected

to discrimination on the bases of race (Black), sex (Male), and

reprisal (prior EEO activity) and hostile work environment when

on December 30, 2005, he received an email removing him from his

duties and responsibilities."   (ECF No. 13-34).

   After each of the three complaints was investigated, Thorn

requested a hearing before an EEOC Administrative Judge ("AJ").

---

[9]    The agency initially dismissed part of the complaint
for failure to state a claim and untimely contact with an EEO
counselor.   The Office of Federal Operations remanded after
finding that a portion of the complaint had been improperly
dismissed.   *See Thorn v. Leavitt*, Appeal No. 01A54113, 2006 WL
167630 (E.E.O.C. Jan. 11, 2006).

*See Thorn v. Sebelius*, Appeal No. 0120080494, 2009 WL 1733958, at *1 (E.E.O.C. June 11, 2009). The AJ granted the agency's motion for a decision without a hearing and issued a decision without a hearing on August 30, 2007. (*Id.*). The Office of Federal Operations ("OFO") of the Equal Opportunity Commission affirmed the decision on appeal on June 11, 2009.

Before the OFO issued its decision on Thorn's appeal, he filed a three-count complaint in the United States District Court for the District of Columbia. (*See* ECF No. 1). That complaint advances three claims under Title VII of "race discrimination," "hostel [sic] work environment," and "reprisal." (*Id.* at 8-10). After the Secretary filed an unopposed motion to dismiss or transfer (ECF No. 4), Judge Friedman transferred the case to this district (ECF No. 8). The Secretary then filed the present motion on April 14, 2010 (ECF No. 13), which Thorn opposed on July 26, 2010 (ECF No. 25).

## II.  **Standard of Review**

The Secretary has moved to dismiss or, alternatively, for summary judgment. Because both parties rely extensively on matters outside the pleadings, the court will treat the motion as a motion for summary judgment. *See Walker v. True*, 399 F.3d 315, 319 n.2 (4th Cir. 2005); *Offen v. Brenner*, 553 F.Supp.2d 565, 568 (D.Md. 2008).

A court may enter summary judgment only if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008). Summary judgment is inappropriate if any material factual issue "may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *JKC Holding Co. LLC v. Washington Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting Fed.R.Civ.P. 56(e)). "A mere scintilla of proof . . . will not suffice to prevent summary judgment." *Peters v. Jenney*, 327 F.3d 307, 314 (4th Cir. 2003). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249-50. (citations omitted). At the same time, the court must construe the facts that are presented in the light most favorable to the party opposing the motion. *See Scott v. Harris*, 550 U.S. 372, 378 (2007); *Emmett,* 532 F.3d at 297.

18

## III. Analysis

Thorn's complaint asserts three claims: race-based discrimination, retaliatory hostile work environment, and retaliation. It must first be determined which of these claims Thorn has exhausted in the administrative claims process. Each remaining claim will then be addressed individually. In doing so, it is important to keep in mind that this court "does not sit as a kind of super-personnel department weighing the prudence of employment decisions made by [employers] charged with employment discrimination." *Amirmokri v. Abraham*, 437 F.Supp.2d 414, 424 (D.Md. 2006) (quoting *DeJarnette v. Corning Inc.*, 133 F.3d 293, 299 (4th Cir. 1998)). Even when the employer is a federal agency, courts have an important duty in the anti-discrimination context "not to invade the province of another in circumstances which the law does not allow." *Hux v. City of Newport News, Va.*, 451 F.3d 311, 315 (4th Cir. 2006).

### A.    Administrative Exhaustion

The Secretary first contends that Thorn did not raise several of the allegations in his present complaint in the administrative process. Consequently, the Secretary suggests that the court is without jurisdiction to consider them. "Before filing suit under Title VII, a plaintiff must exhaust h[is] administrative remedies by bringing a charge with the EEOC." *Smith v. First Union Nat'l Bank*, 202 F.3d 234, 247 (4th

Cir. 2000).  Although the charge defines the scope of the right to file a subsequent civil suit, the initial administrative complaint does not create strict, impenetrable limits on those subsequent rights.  Rather, the scope of the civil action is confined to "those discrimination claims stated in the initial charge, those reasonably related to the original complaint, and those developed by reasonable investigation [of that complaint]."  *Jones v. Calvert Group, Ltd.*, 551 F.3d 297, 300 (4th Cir. 2009) (quotation marks omitted).

Civil suits may not present entirely new factual bases or entirely new theories of liability not found in the initial EEOC complaint.  Thus, a plaintiff fails to exhaust his claims when "his administrative charges reference different time frames, actors, and discriminatory conduct than the central factual allegations in his formal suit."  *Chacko v. Patuxent Instit.*, 429 F.3d 505, 506 (4th Cir. 2005).  Moreover, "a claim in formal litigation will generally be barred if the EEOC charge alleges discrimination on one basis, such as race, and the formal litigation claim alleges discrimination on a separate basis, such as sex."  *Jones*, 551 F.3d at 300.

Certain of the allegations made in the complaint seem far afield from those raised in Thorn's three administrative complaints.  For instance, Thorn's complaint here references promotion and review decisions in 1999 and 2002.  (ECF No. 1 ¶¶

5-6).  In contrast, the earliest event referenced in the administrative complaints occurred in June 2003.  (ECF No. 13-32).  The early promotion and review decisions also appear to involve supervisors other than the two central players in Thorn's administrative complaints, Hulen and Kaczorowski.  In addition, the complaint alludes generally to the fact that Thorn was not "recommended for a cash award" during some unspecified period.  That allegation is nowhere to be found in the underlying administrative complaints, either.  In sum, the above allegations were not properly exhausted at the administrative level and cannot be considered in this action.[10]

The Secretary goes too far, however, when she suggests that certain other allegations concerning the telephone conversion project were not raised below.  In her view, two additional allegations must be ignored:  the instance wherein Kaczorowski asked a contractor "leading questions" about Thorn's performance on the project (ECF No. 1 ¶ 9) and the negative evaluation remark Thorn received about the project (*id.* ¶ 13).  But these allegations seem reasonably related to Thorn's complaint at the

_____

[10]    Thorn argues that some of these facts were mentioned in affidavits he filed at the administrative level.  There is no apparent authority for the notion that a mere reference to some fact exhausts claims related to the fact.  The inquiry is whether the allegation was "stated in the initial charge, . . . reasonably related to the original complaint, [or] . . . developed by reasonable investigation."  *Jones*, 551 F.3d at 300.

administrative level that Kaczorowski had instructed a contractor on the telephone project not to speak with Thorn. They all relate to the same fundamental theme: his supervisors' displeasure with Thorn concerning the telephone project. As such, the associated two instances of supervisor behavior opposed by the Secretary are properly before the court.

As explained above, there must also be a *legal* nexus between the administrative and civil actions. In one count of his complaint, "race discrimination," Thorn ignores this requirement and attempts to advance a new theory of discrimination not advanced below. In particular, he states that he was "subject to a series of disciplinary actions by his supervisor in June, July and August 2003 which were based solely on his race." (ECF No. 1 ¶ 29). In his administrative complaint, Thorn states that these activities were part of "a hostile work environment *in reprisal for engaging in prior protected EEO activity*." (ECF No. 13-32 (emphasis added)). Thorn cannot transform what was once a retaliation claim into a race-based discrimination claim. Any race-based discrimination claim premised on the emails in June, July, and August 2003 is barred.[11]

---

[11] In a footnote argument, Thorn suggests he is free to raise a new claim of retaliation, separate and apart from those he raised below. (ECF No. 25, at 13 n.8 (citing *Allen v.*

## B.  Race-Based Discrimination[12]

Title VII bars federal government employers from engaging in "any discrimination based on race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-16.[13]  In the first count of his complaint, Thorn argues that he was the victim of such discrimination.

---

*Rumsfeld*, 273 F.Supp.2d 695, 704 (D.Md. 2003)).  The alleged retaliation in this case, however, occurred *before* he filed his EEO complaint.  *Bonds v. Leavitt*, 647 F.Supp.2d 541, 555 (D.Md. 2009) ("The typical rule that a retaliation claim may be raised in the district court that was not included in the EEO complaint is inapplicable here because her alleged retaliation claim could have been raised in the original EEO complaint."); *accord Tillbery v. Kent Island Yacht Club, Inc.*, No. CCB-09-2956, 2010 WL 2292499, at *6 (D.Md. June 4, 2010) ("A retaliation claim may be raised for the first time in federal court by relating back to a previous EEOC charge, so long as the retaliatory conduct complained of occurred *after* the EEOC charge was filed." (citations omitted)).

[12]  It is not clear that Thorn intends to raise a gender-based intentional discrimination claim.  The Secretary references gender-based discrimination in moving for summary judgment.  (ECF No. 13-1, at 16).  Although the complaint states that it arises out of "hostile environment based upon his race" and "acts of reprisal by his employer," it also references duties allegedly taken from him and given to "white females."  Similarly, in his opposition, he again refers to the "white females" who were treated more favorably.  (ECF No. 25, at 16, n.11).  Nowhere, however, does Thorn specifically assert a gender discrimination claim.

[13]  "Notwithstanding the differences in wording, sections 2000e-2 and 2000e-16 generally have been treated as comparable, with the standards governing private-sector claims applied to claims under section 2000e-16."  *Bhella v. England*, 91 F.App'x 835, 844 (4th Cir. 2004).

Thorn has not presented any direct evidence that an impermissible factor such as race motivated the Secretary's actions. Thus, he seeks to avoid summary judgment using the familiar burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under *McDonnell Douglas*, Thorn must first establish a prima facie case of discrimination. *Diamond v. Colonial Life & Accident Ins. Co.*, 416 F.3d 310, 318 (4th Cir. 2005). "Absent direct evidence, the elements of a prima facie case of discrimination under Title VII are: (1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class." *Coleman v. Md. Court of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010). After establishing a prima facie case, Thorn must then demonstrate that "the employer's proffered reason for taking an adverse employment action is actually a pretext for discrimination." *Diamond*, 416 F.3d at 318 (quotation marks omitted).

The Secretary attacks the third element of the prima facie case; she suggests that Thorn has suffered no adverse employment action. Perhaps reading the complaint here and the

administrative complaint in tandem,[14] the Secretary presents (and rejects) two candidates for adverse actions underlying the discrimination claim: (1) the July 2005[15] counseling letter and (2) the shift to a new scheduling system, Scheduling.com.[16]

The July 2005 counseling letter is not an adverse employment action. "An adverse employment action is a discriminatory act that 'adversely affect[s] the terms, conditions, or benefits of the plaintiff's employment.'" *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 219 (4th Cir. 2007). "Although conduct short of ultimate employment decisions can constitute adverse employment action, there still must be a tangible effect on the terms and conditions of employment." *Geist v. Gill/Kardah P'ship*, 671 F.Supp.2d 729, 737 n.6 (D.Md. 2009). The letter of counseling here did not actually implement

---

[14] The complaint does not specifically mention the letter of counseling in its "race discrimination" count. (ECF No. 1 ¶¶ 27-31). It does, however, state that the letter "was a deliberate and systematic pattern of discrimination against him." (*Id.* ¶ 25).

[15] The complaint refers to a letter of counseling sent on July 6, 2006 (ECF No. 1 ¶ 25), but both parties now apparently agree – in accordance with the evidence in the record - that the letter was sent in 2005.

[16] In the "race discrimination" count, the complaint also discusses two other instances when (1) Thorn was "denied a promotion" and (2) Thorn was "subject to a series of disciplinary actions . . . in June, July and August of 2003." As the court has already explained, these instances are not considered because they were not raised in the administrative claims process.

any discipline. Rather, it merely cautioned that discipline could follow if inadequate performance did not improve and provided constructive criticism of Thorn's refusal to cooperate with the EIN process. The letter of counseling is therefore akin to a poor performance review or reprimand, both of which are generally not adverse actions. *Cf. Baloch v. Kempthorne*, 550 F.3d 1191, 1199 (D.C. Cir. 2008) (finding, in retaliation context, that letter of counseling did not constitute adverse action). "A poor performance evaluation is actionable only where the employer subsequently uses the evaluation as a basis to detrimentally alter the terms or conditions of the recipient's employment." *James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 377 (4th Cir. 2004). Similarly, a "[a] reprimand, whether oral or written, does not *per se* significantly alter the terms or conditions of employment," but only becomes an adverse action if it "works a real, rather than speculative, employment injury." *Jeffers v. Thompson*, 264 F.Supp.2d 314, 330 (D.Md. 2003); *accord Nichols v. Hartford Cnty. Bd. of Educ.*, 189 F.Supp.2d 325, 342 (D.Md. 2002); *Newman v. Giant Food, Inc.*, 187 F.Supp.2d 524, 528-29 (D.Md. 2002). There is no indication in the record that the letter of counseling had any tangible effect on the terms or conditions of Thorn's employment. Without such an effect, there is no adverse employment action.

In his opposition to the Secretary's motion, Thorn argues
that the letter of counseling actually reflected a reassignment
of job duties outside his job description – and it is the
reassignment, not so much the letter, that constituted the
adverse action.   It is difficult to find this theory in the
complaint, but even if one gives Thorn the benefit of the doubt,
the claim still does not pass muster.   In certain circumstances,
"[e]xtra work can be a material difference in the terms and
conditions of employment."   *Minor v. Centocor, Inc.*, 457 F.3d
632, 634 (7th Cir. 2006).   For instance, a salaried employee who
is asked to work 10% more hours with no change in pay suffers
more than a 9% hourly pay cut.   Additional duties do not
constitute "adverse employment actions," however, unless they
are so weighty as effectively to change these basic terms of
employment.   For this reason, "other circuits have held that
changes in assignments or work-related duties do not ordinarily
constitute adverse employment decisions if unaccompanied by a
decrease in salary or work hour changes."   *Mungin v. Katten
Muchin & Zavis*, 116 F.3d 1549, 1557 (D.C. Cir. 1997); *cf. James*,
368 F.3d at 376 (stating that a "new job assignment . . . can
only form the basis of a valid Title VII claim if the plaintiff
can show that the reassignment had some significant detrimental
effect" (quotation marks omitted)).   Because Thorn has not
presented any evidence or alleged that his hours, his salary, or

the other terms of his employment changed because of the new EIN-related duties, those additional duties do not constitute adverse action.

The shift to Scheduling.com – which involved shifting many of his duties to other people and not including him on the design team – was also not an adverse action. Thorn characterizes this shift as a "constructive demotion" wherein he assumed the duties of a "data entry clerk." In *Holland*, the Court of Appeals directly addressed this type of reassignment-based Title VII claim, explaining:

> The mere fact that a new job assignment is less appealing to the employee, however, does not constitute adverse employment action. There must be some significant detrimental effect and absent any decrease in compensation, job title, level of responsibility, or opportunity for promotion, reassignment to a new position commensurate with one's salary level does not constitute an adverse employment action even if the new job does cause some modest stress not present in the old position.

487 F.3d at 219 (citations and quotation marks omitted); *see also Boone v. Goldin*, 178 F.3d 253, 256 (4th Cir. 1999). Thorn's duties undeniably changed. Because of changing technologies and evolving systems at CC, Thorn found himself working in a much different environment than the one in which he started. Nevertheless, Thorn has not provided evidence that his title, salary, supervisory responsibilities, or opportunity for

promotion were materially altered. He may have been frustrated that the office that he supervised had contracted, and he may have been irritated that he had not been consulted during the transition, but such aggravations cannot form the basis for a Title VII claim. "[N]ot everything that makes an employee unhappy is actionable adverse action." *Settle v. Baltimore Cnty.*, 34 F.Supp.2d 969, 989 (D.Md. 1999).

Thorn's racial discrimination claim in count one fails.[17]

## C. Retaliatory Hostile Work Environment

In count two of his complaint, Thorn alleges he was subject to a hostile work environment. In the administrative action below, Thorn indicated that this was a *retaliatory* hostile work environment. Thus, the court will confine its consideration to that claim and will disregard any race- or gender-based hostile work environment claim suggested by the complaint.

Title VII prohibits an employer from retaliating against an employee who exercises his Title VII rights. 42 U.S.C. § 2000e-3. Just like the discrimination claim, Thorn may avert summary judgment using the *McDonnell Douglas* burden-shifting framework.

---

[17] Because Thorn has not established any adverse action underlying the alleged discrimination, there is no need fully to consider the Secretary's additional argument that the there were legitimate, non-pretextual reasons for all of the actions of which Thorn complains. A review of the record, however, would suggest that the Secretary is correct: Thorn has not shown that the Secretary's proffered reasons are pretextual.

*See Price v. Thompson*, 380 F.3d 209, 212 (4th Cir. 2004).  To survive summary judgment under *McDonnell Douglas*, Thorn must first establish a *prima facie* case composed of three elements: (1) he engaged in protected activity; (2) the agency took an adverse employment action against him; and (3) there was a causal connection between the protected activity and the adverse employment action.  *See Davis v. Dimensions Health Corp.*, 639 F.Supp.2d 610, 616 (D.Md. 2009); *accord Holland, Inc.*, 487 F.3d at 218.

In this case, Thorn attempts to satisfy the "adverse employment action" requirement by establishing a hostile work environment.  *See Von Gunten v. Maryland*, 243 F.3d 858, 869 (4th Cir. 2001) ("Retaliatory harassment can constitute adverse employment action."), *overruled on other grounds by Burlington N. Santa Fe Ry. v. White*, 548 U.S. 53, 67-68 (2006).  The Supreme Court's decision in *Burlington Northern* would seem to allow for the possibility that a hostile work environment could amount to actionable retaliation, but only if "it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."[18]  548 U.S. at 68 (quotation marks

_____

[18]  The Secretary notes that the Fourth Circuit has not yet applied the more relaxed *Burlington* standard to the federal government in a published decision.  *See Ziskie v. Mineta*, 547 F.3d 220, 229 (4th Cir. 2008).  It nevertheless assumes that the standard applies here.  An unpublished decision of the Fourth

omitted).  Although "Title VII's antiretaliation provision must be construed to cover a broad range of employer conduct," *Thompson v. N. Am. Stainless, LP*, No. 09-291, 2011 WL 197638, at *3 (U.S. Jan. 24, 2011), not every uncomfortable moment in the workplace will constitute an adverse action.  "An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights and minor annoyances that often take place at work." *Burlington*, 548 U.S. at 68.

In his complaint, Thorn suggests he was "subject to a hostile work environment" when (1) "he was informed by Ms. Kaczorowski that he would not be a part of the design team"; (2) "he was not offered any new learning opportunities as it related to the [S]cheduling.com project"; (3) "he received an email on December 30 removing him from his duties and responsibilities as patient appointment system manager."  (ECF No. 1 ¶¶ 33-36).  He clarifies that "the removal of his duties and reassignment of them to his white female coworkers to his white female coworkers [is] the basis of his claim of a hostel [sic] work environment." (*Id.* ¶ 36).  The Secretary nevertheless cites several additional incidents that might be included in the hostile work environment

_____

Circuit suggests that application is appropriate.  *Caldwell v. Johnson*, 289 F.App'x 579, 588 (4th Cir. 2008) ("Our review of the statutory language and recent Supreme Court case law indicates that the [*Burlington*] standard applies to federal employees and private employees alike.").

31

claim, including: (1) the email threatening disciplinary action in June 2003; (2) his tour of duty change in July 2003; (3) his denied transfer request in September 2003; (4) his supervisor's instruction to a telephone systems contractor to no longer work with Thorn; (5) his August 2004 Letter of Instruction; (6) the untimely receipt of his compliment in August 2004; and (7) the "unwarranted reprimands" that came in several emails in 2004.

Fundamentally, the instances of "harassment" cited by Thorn hardly constitute harassment at all. They certainly do not amount to an adverse action. Rather, they amount to instances where Thorn disagreed with the management style or decisions of those who supervised him – and that alone is not actionable under Title VII. *Cf. Webster v. Johnson*, 126 F.App'x 583, 588 (4th Cir. 2005) (noting that stern supervision does not evidence actionable harassment). Moreover, his shifting job responsibilities, even when tied to the other acts Thorn alleges, do not amount to an objectively material adverse action. "Acts that carry 'a significant risk of humiliation, damage to reputation, and a concomitant harm to future employment prospects' may be considered adverse actions, although 'a mere inconvenience or an alteration of job responsibilities will not suffice.'" *Colie v. Carter Bank & Trust, Inc.*, No. 3:09-cv-00086, 2010 WL 4274735, at *10 (W.D.Va.

Oct. 28, 2010) (quoting *Reinhardt v. Albuquerque Pub. Schs. Bd. of Educ.*, 595 F.3d 1126, 1133 (10th Cir. 2010)).

From an objective viewpoint, the record reflects that Thorn's supervisors generally treated him with civility, even in the course of disciplining him or admonishing him. There were no physical threats. There was no apparent humiliation. Although many of Thorn's duties changed because of CC's shift to Scheduling.com, the transition was relatively calm and polite (even though Thorn felt he should have been more involved). As the Fourth Circuit has explained:

> Workplaces are not always harmonious locales, and even incidents that would objectively give rise to bruised or wounded feelings will not on that account satisfy the severe or pervasive standard. Some rolling with the punches is a fact of workplace life. Thus, complaints premised on nothing more than rude treatment by coworkers, callous behavior by one's superiors, or a routine difference of opinion and personality conflict with one's supervisor, are not actionable under Title VII.

*EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315-16 (4th Cir. 2009) (quotation marks, citations, and brackets omitted). Taking all these events together, the actions taken against

Thorn were not sufficiently severe as to dissuade a reasonable employee from engaging in protected activity.[19]

In his opposition to the Secretary's motion, Thorn does not contend that the activities described above were sufficiently pervasive and severe as to constitute a hostile work environment. Instead, he relies on a disjointed theory of "Administrative Res Judicata." (ECF No. 25, at 36). In his view, the court must find that Thorn has established a hostile work environment because the OFO already has. Thorn is wrong as both a factual and a legal matter.

First, the OFO did not find that Thorn stated a viable claim for hostile work environment. The appeal to which Thorn refers came after the Agency denied several of Thorn's claims as

_____

[19] This determination necessarily means that, even if Thorn's race- and gender-based hostile work environment claims were before the court, they would not survive. To advance such claims, Thorn would need to show that his employer engaged in unwelcome conduct that was "sufficiently severe or pervasive as to alter the conditions of [his] employment and create an abusive atmosphere." *EEOC v. Cent. Wholesalers, Inc.*, 573 F.3d 167, 175 (4th Cir. 2009). The harassment must reach such a level as to permeate the workplace with "discriminatory intimidation, ridicule, and insult." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002). If the hostile work environment is not severe enough to state a retaliatory hostile work environment claim, it would not rise to this higher level of severity necessary to state a claim under the substantive discrimination provisions. *See Burlington*, 548 U.S. at 64 ("[T]he retaliation provision, unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment.").

untimely. The Agency viewed Thorn's claims as resting on several discrete instances of alleged retaliation or discrimination. On appeal, the Agency determined that the acts would constitute one unitary course of conduct that *would* be timely. *Thorn*, 2006 WL 167630, at *2. Thorn's argument errs when it relies on a single, out-of-context quotation from that decision: "The Commission finds that a fair reading of the entire record reflects that complainant's complaint concerns matters that comprised a single claim of retaliatory harassment sufficient to create a hostile work environment." *Id*. The quoted language merely reflects the Commission's conclusion that the relevant events encompassed a single timely claim, rather than discrete claims. The decision pertained merely to timeliness and was not a decision on the merits. When the OFO *did* address the merits of Thorn's hostile work environment claim – in the 2009 appeal – it concluded that the evidence was insufficient to find a hostile work environment based on sex, race, or prior protected activity. *Thorn*, 2009 WL 1733958, at *4.

Second, even if the OFO had found that Thorn successfully stated a claim for retaliatory hostile work environment, this court would not be bound by that determination. "[A] federal employee who brings a civil action in the district court must put his employing agency's underlying discrimination at issue if

the OFO accepts those allegations." *Laber v. Harvey*, 438 F.3d 404, 419 (4th Cir. 2006); *accord Murchison v. Astrue*, 689 F.Supp.2d 781, 789 (D.Md. 2010) ("After the employee chooses the second route - appealing the agency's underlying decision - and the OFO either rules against the employee or orders a remedy the employee finds unsatisfactory, the employee again has the opportunity to seek a de novo civil action in federal court (putting the entire issue of discrimination in front of the court)."). To put it bluntly: the OFO's legal conclusions have no relevance at this stage. "[A]dministrative *res judicata* does not operate in a Title VII suit." *Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 112 (1991) (quotation marks omitted).

Therefore, Thorn's claim of retaliatory hostile work environment cannot proceed.[20]

**D.  Retaliation**

Finally, Thorn asserts a claim for retaliation based on several discrete acts. The Secretary contends that Thorn has not established two of the three required elements of a *prima facie* case:  that the agency took an adverse employment action

---

[20]    Even if the "harassment" was sufficient to constitute an adverse action, there is no indication in the record that Thorn actually engaged in any protected activity before the "harassment" began.  Thus, it could not have been retaliatory.

against him; and that there was a causal connection between the protected activity and the adverse employment action.  She also argues that Thorn has not shown her legitimate, non-discriminatory explanations for all the relevant events to be pretextual.

As was noted in the context of Thorn's retaliatory hostile work environment claim, an action will constitute an adverse employment action if "a reasonable employee would have found the challenged action materially adverse, which . . . means it well might have dissuaded a reasonable worker from marking or supporting a charge of discrimination." *Burlington*, 548 U.S. at 68.  Thorn lists several examples of what he takes to be adverse actions:  (1) "retaliatory emails"; (2) a change in his tour of duty; (3) the instruction to Moxley not to work with him; (4) "unwarranted reprimands"; and (5) his lack of involvement in the Scheduling.com project.

Many of these discrete acts of purported retaliation are the same events underlying Thorn's retaliatory hostile work environment, "unpacked" into individual claims.  Just as with that claim, none of these acts would dissuade a reasonable employee from lodging a complaint of discrimination.  Many of these acts – such as the "retaliatory emails," "unwarranted reprimands," Kaczorowski's instruction to Moxley to work directly with her, and Kaczorowski's failure to include Thorn on

the design team – amount to nothing more than unactionable "personal slights." *Adams v. Upper Chesapeake Med. Ctr.*, No. AMD 08-346, 2009 WL 997103, at *4 (D.Md. Apr. 14, 2009). The agency's insistence that Thorn return to an ordinary work schedule (rather than his earlier tour of duty) was also not an adverse action. *Parsons v. Wynne*, 221 F.App'x 197, 199 (4th Cir. 2007) ("Neither her . . . performance evaluation or her removal from the alternative work schedule would have dissuaded a reasonable worker from making or supporting a charge of discrimination." (quotation marks omitted)). The change in duties following CC's shift to Scheduling.com is not sufficiently adverse, either. *Tawwaab v. Va. Linen Serv., Inc.*, No. AW-09-00553, 2010 WL 3000801, at *19 (D.Md. July 28, 2010) ("[A] change in job responsibilities, such as Miller's alleged insistence that Carter perform arbitrary and time-consuming tasks, does not constitute a materially adverse action if the new tasks are not dirtier, more arduous, less prestigious, . . . objectively inferior, [or] possess[ing] [of] any analogous attribute."). Nor was the letter of counseling materially adverse. In short, all of these acts fall well short of the mark. It bears repeating that that "[t]he anti-retaliation provision of Title VII does not protect against petty slights, minor annoyances, and simple lack of good manners." *Geist*, 671 F.Supp.2d at 738 (quotation marks omitted).

Even if Thorn could establish a prima facie case, he has failed to rebut the legitimate, non-discriminatory reasons for each of these actions. "[T]he plaintiff can prove pretext by showing that the explanation is unworthy of credence or by offering other forms of circumstantial evidence sufficiently probative of retaliation." *Price*, 380 F.3d at 212 (quotation marks and brackets omitted). He has not done so. Many of the emails, letters, and reprimands resulted from supervisors' beliefs that Thorn was not performing the duties asked of him. His lack of involvement in the Scheduling.com process stemmed from his supervisors' honest belief that others were better equipped for the task. Thorn and some other employees may have disagreed, but even if his supervisors did underestimate his abilities, that would not render their belief pretextual. *See Price*, 380 F.3d at 209 ("[M]ere mistakes of fact are not evidence of unlawful discrimination. Pretext is a lie, not merely a mistake." (citations and quotation marks omitted)). As for Thorn's shifting job responsibilities, they resulted from (a) CC's wish to modernize its scheduling system and (b) the need to process EIN requests by someone at a supervisor level.

Thorn attempts to demonstrate that these reasons were pretextual by seizing on a few statements from some parties that they did not understand or did not know the reasons behind some of the challenged acts. (*See, e.g.*, ECF No. 25, at 33 (stating

that Hulen did not know why Thorn was not on the design team and concluding that "could only mean that impermissible discrimination was at play")).  The fact that some individuals were less than fully informed does not erase the explanations found in a full reading of the record.  Thorn has not shown pretext.

Count three cannot move forward.

**IV.  Conclusion**

For the foregoing reasons, Defendant's motion, construed as a motion for summary judgment, will be granted.  A separate order will follow.

_____/s/_____
DEBORAH K. CHASANOW
United States District Judge
